382 N.W.2d 2 (1986)
222 Neb. 13
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Corporation, Appellee,
v.
ROYAL INSURANCE COMPANY OF AMERICA, a Corporation, Appellant,
Maxine M. Todd and Jeanne Dennison, Special Coadministrators of the Estate of Jack C. Todd, Deceased, et al., Appellees.
No. 84-772.
Supreme Court of Nebraska.
February 21, 1986.
*4 John F. Simmons of Wright, Simmons & Selzer, Scottsbluff, for appellant.
James M. Mathis of Holtorf, Kovarik, Nuttleman, Ellison, Mathis & Javoronok, P.C., Gering, for appellee State Farm.
Benjamin M. Shaver, Scottsbluff, for appellees Special Coadministrators.
BOSLAUGH, CAPORALE, and GRANT, JJ., and WOLF, District Judge, and COLWELL, District Judge, Retired.
COLWELL, District Judge, Retired.
This is a declaratory judgment action to determine the rights and obligations of two liability insurance companies arising out of a separate pending wrongful death action brought by the coadministrators of the estate of Jack C. Todd, deceased, who died as the result of a pedestrian-auto accident. The uninsured driver of the auto, defendant Michael A. Robinson, was driving it with the permission of defendant Original Equipment Co., doing business as Aulick Truck & Trailer (Aulick), insured by Royal Insurance Company of America. Defendant Richard E. Robinson, the father of Michael, was insured by plaintiff, State Farm Mutual Automobile Insurance Company, providing liability coverage for a nonowned vehicle by a resident of his household, who was Michael. The issue is whether the auto was covered by Aulick's garage policy. The trial court found that both companies were obligated to provide coverage, but Royal's responsibility was primary. Costs were assessed against Royal, including a $7,000 attorney fee allowed to the Todd estate. Royal appeals.
The determination of factual issues in a declaratory judgment action, which would otherwise be an action at law, will be treated in the same manner as if a jury had been waived. Hence a trial court's findings have the effect of a jury verdict and will not be set aside unless clearly wrong.
Roth v. School Dist. of Scottsbluff, 213 Neb. 545, 549, 330 N.W.2d 488, 491 (1983).
Michael was employed as a truckdriver by Aulick Leasing Corp., an unrelated enterprise not insured by Royal. Sometime after 6 p.m. on October 4, 1982, at the Aulick premises, Michael approached Shane Aulick with a request to drive a car home and to return it the next day. He had done so two or three times before. Shane, the manager of Aulick, consented to Michael's taking a 1978 International Scout (Scout) without any other restrictions. Michael left in the Scout en route to his residence, and the accident occurred shortly thereafter. Michael owned an uninsured pickup truck.
Aulick was in the business of auto sales and repair in Scottsbluff, Nebraska, insured by Royal under a garage policy, later discussed in detail. Royal denies coverage under the garage policy because the Scout was neither an "owned auto" nor a "covered auto" as provided in the policy. The trial court found that Aulick owned the Scout.
Royal assigns four errors: (1) That the court erred in finding that Royal had coverage; (2) and (3) (considered together) That the court erred in finding that Aulick owned the Scout; and (4) That the court erred in the allowance of the $7,000 attorney fee.
Errors Nos. (2) and (3) are first discussed. The policy provided that there was coverage for all owned autos. The ownership question is complicated by five separate certificate of title (title) transactions and two separate chains of car title.
1. "Colorado title." No. M 372060 issued May 11, 1978, to International Harvester Company, showing the previous title number as MSO (manufacturer's statement of origin). This title was assigned to "Aulick Truck & TLR" on September 12, 1978.
*5 2. "Aulick 1979 title." No. 21F 44156 issued to Aulick Truck & Trailer on March 1, 1979, showing the previous title number as Co.M 372060.
3. "Chuck Meyer title." On September 8, 1980, Aulick sold the Scout to Chuck Meyer, and title No. 21F 66822 was issued to him, showing the previous title number as Ne 21F 44156 (Aulick 1979 title). The Meyer title was forthwith delivered to International Harvester Credit Corp. (IHCC) as security for a loan to Meyer. That title was still with IHCC at the time of the accident, although Meyer had traded the Scout back to Aulick on September 15, 1981.
4. "Aulick 1983 title." No. 21G 41810 issued to Aulick Truck & Trailer on November 23, 1983, after the accident, showing the previous title number as COLO M 372060 (the Colorado title). For some unexplained reason Aulick still retained the original Colorado title, which was used again to secure its 1983 title. Apparently, the county clerk had failed to retain the Colorado title when the Aulick 1979 title was issued.
5. "Haley title." Issued to Frank Haley on March 29, 1984, when Aulick sold the Scout to him.
A purchaser who receives possession of an automobile without also obtaining from the owner an assignment of the certificate of title properly notarized and duly executed in accordance with the statutes then in effect acquires no "right, title, claim, or interest in or to" a motor vehicle and does not thereby become the owner of the vehicle in question. State Farm Mut. Auto. Ins. Co. v. Fitzgerald, 214 Neb. 226, 334 N.W.2d 168 (1983).
Title to the Scout was registered in the name of Meyer when it was sold to him on September 8, 1980, on an installment sale contract with recourse, which was noted as a lien on the title when delivered to IHCC, where the Meyer title remained at the time of the accident. When Meyer traded the Scout back to Aulick on September 15, 1981, the IHCC loan had not been paid, and no arrangements were made to get the title assigned. Shane Aulick suggested to Meyer that some paperwork would be required in the future for Meyer to assign the title to Aulick. Without resolving the authenticity of the Aulick 1983 title, we are here concerned with the Scout title at the time of the accident.
Appellees coadministrators of the estate urge that during the September 15, 1981, to November 23, 1983, period, Aulick claimed and exercised ownership of the Scout along with its possession by using it as a utility shop car, driving it 19,776 miles, by including it in its inventory of cars owned for sale, and by holding it out for sale. At the time of the accident it bore dealer's plates. The evidence shows that both Meyer and Aulick understood and intended that Aulick should have full ownership of the Scout; however, it is noted that the same intention was present in Fitzgerald.
In addition to the evidence supporting Aulick's claim of ownership, it is urged that as a licensed dealer Aulick was not required to obtain a title, citing Neb.Rev. Stat. § 60-106(6) (Reissue 1978), which provides in part: "[L]icensed dealers need not apply for certificates of title for motor vehicles ... in stock or acquired for stock purposes, but upon transfer of the same they shall give the transferee a reassignment of the certificate of title on such motor vehicle...." (Emphasis supplied.) Section 60-106 describes general procedures for obtaining titles. Section 60-106(6) is a special procedure for the benefit of licensed dealers to avoid the paper formality of a dealer's obtaining a title for each vehicle held for sale. It does not avoid the requirement discussed in Fitzgerald and provided in Neb.Rev.Stat. § 60-105(1) (Reissue 1984), that in order for a person, which includes a dealer, to claim ownership of a vehicle, the dealer must obtain a duly executed assignment of the certificate of title for a vehicle when it is acquired as part of the stock held for sale. Thereafter, that same certificate can be reassigned, § 60-106(6), by the dealer upon sale. Aulick *6 never acquired an assignment of the Meyer title.
Although the application of the Fitzgerald rule to Aulick's auto sales and auto repair business may seem impractical in an auto sales business, considering the regular daily transfer of car titles and customer use of cars, lost titles, delayed assignment and delivery of titles from customers, and other inoffice business details, nevertheless existing statutes such as § 60-105(1) must be strictly observed, and it is possible for the insured and insurer to formulate and tailor the details of insurance coverage to meet their business needs and responsibilities. Fitzgerald is dispositive of the ownership question; we agree with Royal that Aulick was not the owner of the Scout at the time of the accident, and the court erred in so finding.
That leaves unanswered the first assignment of error, since Royal further contends that the policy does not cover Michael as an insured under the policy because the Scout was not a "covered auto." It was an issue at trial; however, the judge made no findings thereon. It is a key issue here.
Generally, a garage policy is designed to protect automobile dealers, garage keepers, and owners of auto service stations against loss by reason of injury to other property or persons by the use of their autos. Such policies are designed to care for the specialized needs of the particular operation. They are usually construed in the same manner as other insurance contracts, but in case of doubt the policies are to be construed most strongly against the insurance company. Constitution Indemnity Co. v. Lane, 67 F.2d 433 (6th Cir.1933). See, generally, 8 Blashfield Automobile Law and Practice § 319.2 (West 3d ed. 1966).
Royal urges that the Scout was not a covered auto because its use at the time of the accident was for Michael's personal transportation, which was not "in connection with garage business," as provided in the policy.
A covered auto, as defined by the policy, is (1) any owned auto and (2) any nonowned auto "used in connection with your garage business described in these declarations." (Emphasis supplied.) While garage business is not defined in the policy, "garage operations" is defined as "the ownership, maintenance, or use of locations for garage business.... Garage operations includes the ownership, maintenance or use of the autos indicated in Part II as covered autos. Garage operations also include all operations necessary or incidental to a garage business." (Emphasis supplied.)
This court has consistently held that an insurance contract should be considered as any other contract and should be given effect according to the ordinary sense of the terms used. Dairyland Ins. Co. v. Esterling, 205 Neb. 750, 290 N.W.2d 209 (1980). However, when the provisions of the insurance contract are ambiguous or are susceptible of two constructions, the policy must be liberally construed in favor of the insured, or the construction which provides coverage must be adopted. Safeco Ins. Co. of America v. Husker Aviation, Inc., 211 Neb. 21, 317 N.W.2d 745 (1982); Hartford Acc. & Ind. Co. v. Olson Bros., Inc., 187 Neb. 179, 188 N.W.2d 699 (1971). The above terms of the Royal policy relating to nonowned autos are conflicting and ambiguous.
The record provides ample evidence to support a finding that Aulick's use of the Scout was covered because it was a nonowned auto used in connection with the garage business. Shane Aulick, in his deposition, testified that Aulick assumed that it had responsibility as far as insurance purposes and that it carried the Scout on its books as part of the used vehicle inventory held for resale. Shane Aulick also stated that, as an officer of Aulick Truck & Trailer, he considered that the Scout belonged to it. At the time of the accident the Scout had dealer plates attached to it which belonged to Aulick Truck & Trailer. During the time the Scout was in Aulick's possession and was held in its used car *7 inventory, it was driven for approximately 19,776 miles. Vince Aulick testified that the Scout was used whenever transportation was needed in the operation of the garage business. These facts are contrary to Royal's contention that the Scout was not used in connection with the garage business. That leaves Royal's argument that the use of the Scout at the time of the accident was not covered by the policy.
In a similar case the Missouri Court of Appeals found that "[a]ny automobile held or owned by a dealer and actually being offered for sale, is used principally in his business. The fact that it was ... temporarily loaned ... is not controlling of its principal use, no more than that other automobiles in stock were temporarily `stored' on the lot." Rivas v. Killins, 346 S.W.2d 698, 700 (Mo.App.1961). An Illinois appellate court, in interpreting a garage policy, also held that it was immaterial that a loaned automobile was not owned by the repair shop and that the customer who borrowed it was using the vehicle on a social or personal mission. The insurer on the garage policy was thus held liable for damages arising from an accident the customer was involved in while driving the borrowed car. Allstate Ins. Co. v. Urban, 15 Ill.App.2d 386, 146 N.E.2d 387 (1957). While on the present facts it was apparent that Michael Robinson was not a customer, the principles are still applicable, and Michael Robinson was an insured driving a covered auto.
Royal cites Wigington v. Ocean Accident & Guarantee Corporation, 120 Neb. 162, 231 N.W. 770 (1930), and Truck Ins. Exchange v. State Farm Mut. Auto. Ins. Co., 182 Neb. 330, 154 N.W.2d 524 (1967), in support of no coverage. Both cases are distinguishable on the facts. Likewise, its reliance on 8 Blashfield Automobile Law and Practice § 317.4 (West 3d ed. 1966), is inapplicable, since it relates to exclusions for pleasure, business, and commercial uses under personal liability policies which are not comparable in purpose to a garage policy.
Under the facts and circumstances here, Royal's narrow interpretation of the garage policy is untenable; it is an attempt to exclude coverage by interpretation rather than by plain terms in the policy that it prepared.
We conclude and find that at the time of the accident the Scout continued to be a nonowned auto incidentally used as a part of Aulick's garage business and operations and that Michael was driving the Scout with permission while he was a covered insured driver under Royal's garage policy.
The last assigned error concerns the allowance of attorney fees to defendant Todd estate.
"It is the practice in this state to allow the recovery of attorneys' fees only in such cases as are provided for by law, or where the uniform course [of] procedure has been to allow such recovery. As a general rule of practice in this state, attorneys' fees are allowed to the successful party in litigation only where such allowance is provided by statute."
Hawkeye Casualty Co. v. Stoker, 154 Neb. 466, 485, 48 N.W.2d 623, 634 (1951); Quinn v. Godfather's Investments, 217 Neb. 441, 348 N.W.2d 893 (1984).
Statutory authority is found in Neb.Rev. Stat. § 44-359 (Reissue 1984):
In all cases where the beneficiary, or other person entitled thereto, brings an action upon any type of insurance policy... against any company, person or association doing business in this state, the court, upon rendering judgment against such company, person or association, shall allow the plaintiff a reasonable sum as an attorney's fee in addition to the amount of his recovery, to be taxed as part of the costs. If such cause is appealed, the appellate court shall likewise allow a reasonable sum as an attorney's fee for the appellate proceedings....
It is noted that prior to 1971 Neb.Laws, L.B. 958, the first sentence of § 44-359 provided: "In all cases where the beneficiary, or other person entitled thereto, brings an action at law...." The 1971 *8 amendment deleted "at law" from the statute.
A declaratory judgment proceeding is an action contemplated in § 44-359. Workman v. Great Plains Ins. Co., Inc., 189 Neb. 22, 200 N.W.2d 8 (1972). Where the insurer brings the declaratory judgment action and the insured defendant prevails, the insured can claim an attorney fee allowance. State Farm Mut. Auto. Ins. Co. v. Selders, 189 Neb. 334, 202 N.W.2d 625 (1972).
The authority to bring an action under § 44-359 has long been interpreted to require that the beneficiary or other person must be entitled to bring an action on the policy at the time the suit was instituted. See Hawkeye Casualty Co. v. Stoker, supra. A judgment creditor of an insured is a person entitled to bring an action and recover fees. Metcalf v. Hartford Acc. & Ind. Co., 176 Neb. 468, 126 N.W.2d 471 (1964).
Appellees coadministrators of the Todd estate contend that Holt County Co-op Assn. v. Corkle's, Inc., 214 Neb. 762, 336 N.W.2d 312 (1983), a suit on account, is authority for the allowance of attorney fees here. In that case the court noted that there was neither a statute nor a known uniform course of procedure authorizing such allowance; however, an allowance was authorized and made pursuant to the inherent powers of the trial court under certain unusual circumstances amounting to "conduct during the course of litigation which is vexatious, unfounded, and dilatory, such that it amounts to bad faith." Id. at 767, 336 N.W.2d at 315; annot., 31 A.L. R.Fed. 833 (1977). That rule is not applicable here, since there is a specific statute, § 44-359, and the record does not support a finding of bad faith on the part of appellant.
It is clear that the Todd estate was not a beneficiary, an insured, a judgment creditor of the insured, or a person entitled to bring an action on the Royal policy at the time suit was commenced, as required in Hawkeye. At most, it was a potential judgment creditor. Accordingly, it could not claim attorney fees under § 44-359, and the trial court so found.
The trial court went on to find and allow attorney fees as a part of a "uniform course of procedure," giving these reasons here summarized: (1) The bringing of the declaratory judgment proceeding prior to resolution of the tort liability question was the decision of the insurance companies; (2) The shoddy business practices of Aulick were the cause of the insurance coverage issue; (3) As in No. 1, timing in the determination of the "person entitled" was a factor; (4) It is necessary to judicially determine that in like circumstances the inclusion of an attorney fee is a uniform course of procedure as a cost of litigation; and (5) Plaintiff provided the expense of the tort litigation and Royal delayed the orderly trial process therein. These reasons do not meet the bad faith rule in Holt.
The Legislature, for more than 70 years, has seen fit to provide for the allowance of attorney fees, § 44-359 (originally Rev. Stat. § 3212 (1913)), in certain cases brought on insurance policies. The Todd estate as a potential judgment creditor cannot claim such fees under the statute, and we are not aware of a uniform course of procedure to allow the same here. The allowance of a $7,000 attorney fee to the Todd estate, chargeable to Royal as part of the costs, was error, and the same is set aside.
The finding of the trial court that Aulick was the owner of the Scout was error. However, the judgment that Royal was obligated under Aulick's garage policy was correct, for other reasons heretofore discussed. It has long been the rule in this jurisdiction that a proper judgment will not be reversed even if the trial court did not give the right reasons. Leo A. Daly Co. v. Omaha-Douglas Public Bldg. Comm., 212 Neb. 533, 324 N.W.2d 252 (1982).
AFFIRMED IN PART, AND IN PART REVERSED.